**STATE OF LOUISIANA, Louisiana Municipal Association and Parish of Cameron, et al., Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 73-3478.**

United States Court of Appeals, Fifth Circuit.

Nov. 8, 1974.

Rehearing and Rehearing En Banc Denied Dec. 13, 1974.

Arnold D. Berkeley, Washington, D. C., William J. Guste, Atty. Gen., Baton Rouge, La., for State of Louisiana, Louisiana Municipal Assn. and Parish of Cameron.

Richard M. Merriman, Peyton G. Bowman, III, Washington, D. C., Sherwood W. Wise, Richard B. Wilson, Jr., Wise, Carter, Child, Steen & Caraway, Jackson, Miss., for Mississippi Power and Light Co.

John T. Miller, Jr., Washington, D. C., Richard W. Duesenberg, Monsanto Co., St. Louis, Mo., for Monsanto Co.

John T. Miller, Jr., Washington, D. C., George W. Hugo, Texasgulf, Inc., Houston, Tex., for Texasgulf, Inc.

John T. Miller, Jr., Washington, D. C., Richard Sexton, Vice President & Gen. Counsel, SCM Corp., New York City, for Allied Paper Inc.

John F. Harrington, George J. Meiburger, Christopher T. Boland, Robert G. Hardy, Gallagher, Connor & Boland, Washington, D. C., Robert O. Koch, Steve H. Finch, Owensboro, Ky., for Texas Gas Transmission Corp.

J. Evans Attwell, William P. Pannill, Vinson, Elkins, Searls, Connally & Smith, and Jack D. Head, Texas Eastern

Transmission Corp., Houston, Tex., Platt W. Davis, III, Washington, D. C., for Texas Eastern Transmission Corp.

Nelson Jones, Clayton L. Orn, Anderson, Brown, Orn, Pressler & Jones, Houston, Tex., for New Orleans Public Service, Inc.

Wm. Warfield Ross, Wald, Harkrader & Ross, Washington, D. C., Stanley Plettman, Orgain, Bell & Tucker, Beaumont, Tex., for Gulf States Utilities Co.

William B. Cassin, Vice President and General Atty., United Gas Pipe Line Co., Houston, Tex., W. DeVier Pierson, Peter J. Levin, Washington, D. C., for United Gas Pipe Line Co.

William A. Smith, Harry L. Albrecht, Birmingham, Ala., for Southern Natural Gas Co.

William W. Bedwell, John J. Mullally, Bedwell & Mullally, Washington, D. C., James H. Wuller, Secretary & General Atty., Mississippi River Transmission Corp., St. Louis, Mo., for Mississippi River Transmission Corp.

Norman A. Flaningam, Charles R. Brown, Washington, D. C., David E. Weatherwax, Philip L. Jones, Clarksburg, W. Va., James E. Wright, Jr., New Orleans, La., Henry P. Sullivan, Richard B. Gordon, Pittsburgh, Pa., for Consolidated Gas Supply Corp.

Edward J. Grenier, Jr., Richard P. Noland, Richard J. Pierce, Jr., Sutherland, Asbill & Brennan, Washington, D. C., Ross L. Malone, William A. Vaughan, General Motors Corp., Detroit, Mich., George Mabry, Johns-Manville Corp., Denver, Colo., for General Motors Corp. and Johns-Manville Corp.

Sheldon A. Zabel, Raymond P. Buschmann, Schiff, Hardin & Waite, Chicago, Ill., for Illinois Power Co.

Joseph M. Wells, Paul E. Goldstein, Chicago, Ill., for Natural Gas Pipeline Co. of America.

John S. Schmid, Glendening & Schmid, Washington, D. C., for Boston Gas Co.

Michael R. W. Green, LeBoeuf, Lamb, Leiby & MacRae, New York City, for St. Regis Paper Co.

J. David Mann, Jr., Morgan, Lewis & Bockius, Washington, D. C., for Laclede Gas Co.

William A. Wood, Jr., William G. Riddoch, Thomas G. Johnson, Houston, Tex., for Shell Oil Co.

Bryce Rea, Jr., John R. Bagileo, Washington, D. C., for Willmut Gas and Oil Co.

Jerome Ackerman, James R. McCotter, Washington, D. C., for Air Products and Chemicals, Inc., American Cyanamid Co., International Paper Co., Scott Paper Co., and Stauffer Chemical Co.

Robert J. Haggerty, Charles E. McGee, John T. Ketcham, McGee & Ketcham, Washington, D. C., for Algonquin Gas Transmission Co.

Albert J. Feigen, Washington, D. C., Paul G. Borron, Jr., Borron & Delahaye, Plaquemine, La., for American Sugar Cane League of the U. S. A., Inc.

J. Parker Connor, Mullin, Connor & Rhyne, Washington, D. C., for First Chemical Corp.

Richard A. Solomon, Wilner & Scheiner, Washington, D. C., Peter H. Schiff, Albany, N. Y., for Public Service Commission for the State of New York.

Michael J. Manning, Fulbright, Crooker & Jaworski, Washington, D. C., Jefferson D. Giller, Fulbright, Crooker & Jaworski, Houston, Tex., for United Gas, Inc.

Howard E. Wahrenbrock, Washington, D. C., John M. Kuykendall, Jr., Jackson, Miss., for Mississippi Valley Gas Co.

Howard E. Wahrenbrock, Washington, D. C., John M. Kuykendall, Overstreet & Kuykendall, Jackson, Miss., for Three City Gate Customers, Mobile Gas Service Corp., Mississippi Valley Gas Co., and Clarke-Mobile Counties Gas Dist.

Carroll L. Gilliam, Grove, Jaskiewicz & Gilliam, Washington, D. C., for Industrial Gas Users.

Jerome Ackerman, James R. McCotter, Washington, D. C., for International Paper Co.

Andrew P. Carter, New Orleans, La., for Louisiana Power & Light Co.

John W. Glendening, Jr., Washington, D. C., for Boston Gas Co.

Leo E. Forquer, Gen. Counsel, George W. McHenry, Jr., Acting Sol., Federal Power Commission, Washington, D. C., for Federal Power Commission.

John J. Hill, Atty. Gen., Larry F. York, First Asst. Atty. Gen., Austen H. Furse, J. Milton Richardson, Asst. Attys. Gen., Austin, Tex., for State of Texas, amicus curiae.

Evelle J. Younger, Atty. Gen., Robert H. O'Brien, Sr., Asst. Atty. Gen., Richard A. Haft, Deputy Atty. Gen., Jane Chatten, Los Angeles, Cal., for State of California, amicus curiae.

Before GEWIN, THORNBERRY and COLEMAN, Circuit Judges.

THORNBERRY, Circuit Judge:

## I. Introduction

In this case we review Opinions 647 [1] and 647–A,[2] in which the Federal Power Commission approved a final curtailment plan for United Gas Pipe Line Company (United).* In essence this appeal is a bitter economic struggle in which each party seeks to minimize the losses dealt it by the now famous natural gas shortage. FPC contends the curtailment plan represents its best possible effort under trying circumstances; the intervenors compliment FPC's wisdom and defend its plan; and the petitioners cry "foul", raising a host of reasons why FPC should issue a plan more favorable to them. They say, *inter alia,* that FPC has no authority to curtail on an end-use basis; that FPC has no authority to order a new curtailment plan without finding the old one inadequate; that curtailment plans must be accompanied by environmental impact statements; that FPC improperly attempted to exonerate United from all liability flowing from its gas shortage; that FPC's curtailment plan is not supported by substantial evidence; and that the plan is not ripe for review. We find merit in some of these contentions and therefore must remand.

Under pressure to survive the worsening gas shortage, the parties in this case ironically seek to find shelter in federal legislation designed not for corporate giants but for the consumer and average citizen. Congress intended the FPC, acting under the Natural Gas Act,[3] to "protect consumers from exploitation at the hands of natural gas companies," FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 611, 64 S.Ct. 281, 291, 88 L.Ed. 333, and ensure that the public receives just and reasonable gas prices. Atlantic Refining Co. v. Public Service Commission, 1959, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312. See Comment, FPC Natural Gas Allocation: Curtailment in Context, 50 Texas L.Rev. 1370 (1972). In this case, however, by seeking FPC approval of its curtailment plans United is using the Commission as a shield against potentially massive contractual liability growing out of its inability to meet contractual commitments. Not to be outdone, its jilted corporate customers seek to use the National Environmental Policy Act (NEPA)[4] as a sword to destroy United's FPC shield. They claim that FPC cannot approve (or impose) a curtailment plan without first filing an environmental impact statement. Thus we are presented with the interesting spectacle of industrial giants using environmental legislation to frustrate a consumer-oriented agency's attempt to protect another industrial giant.

## II. Background

United, one of the nation's largest pipeline companies, owns and operates a

---

1. Opinion No. 647, Docket Nos. RP 71–29, RP 71–120, United Gas Pipe Line Co., 49 FPC 179 (Jan. 12, 1973).

2. Opinion No. 647–A, Docket Nos. RP 71–29, RP 71–120, United Gas Pipe Line Co. (May 30, 1973).

* Twenty-four separate petitions for review were timely filed, and all have been consolidated into the case before us.

3. 15 U.S.C.A. § 717 et seq. (1963).

4. 42 U.S.C.A. § 4321 et seq. (1973).

natural gas pipeline system that extends throughout the states of Texas, Louisiana, Mississippi, Alabama, and Florida. United sells its gas to local distribution systems ("city gates"), industries, power plants, and other pipeline companies. Its five major pipeline customers distribute United's gas through the Middle South, the Midwest, the Northeast, and the Atlantic Coast.[5] Thus a shortage in United's supplies necessarily must be felt throughout the eastern half of the United States.

### A. The Shortage Materializes

The shortage evolved from possibility to reality sometime prior to the fall of 1970 when United realized that its supplies were insufficient to see its customers through the winter heating season of 1970–71; curtailment was unavoidable. On October 26, 1970, United initiated the proceedings that have culminated in the instant case by petitioning FPC in Docket No. RP71–29 for a declaratory order holding that its proposed three-priority curtailment plan was consonant with the curtailment provisions in its tariffs and direct sale contracts. On November 1 curtailment began; its basis was "end use." Gas used for industrial purposes was curtailed first; gas for generation of electricity for domestic consumption would be next; and last to be curtailed was gas used by domestic consumers. Gas was curtailed ratably within each category, and all the gas in one category was required to be shut off before the next higher category would be curtailed.

On December 10, 1970, FPC ordered a hearing that would determine:

. . . (a) the proper interpretation of Section 12 of the General Terms and Conditions of United's FPC Gas Tariff and whether the curtailment program placed into effect by United on November 1, 1970, is in accordance therewith, (b) whether it would constitute undue discrimination under the provisions of the Natural Gas Act if a curtailment program placed into effect on United's system did not apply equally to the jurisdictional and direct sales customers of United, and (c) whether it would be appropriate for the Commission at this time to consider the question o[f] reallocation of United's total gas supply among all of United's customers, and if so, on what basis such reallocation be made; . . . .

Order Providing for Hearing on Petition and Amended Petition and Establishing Procedures and Permitting Intervention, Docket No. RP71–29, United Gas Pipe Line Co. (Dec. 10, 1970). The hearings lasted only two days. The parties, with the exception of Monsanto, entered into a compromise agreement under which United would curtail through March 31, 1971, and the Commission approved this agreement on December 29.

The peace was short-lived; on February 22, 1971, United filed in Docket No. RP71–29 a supplemental petition for a declaratory order holding that an extension and modification of the curtailment program through the summer months until October 31, 1971, would be consistent with United's tariffs and direct sale contracts. The extension request was the first of a series of important steps that occurred in spring 1971.

Soon after the extension request Louisiana Power & Light Company removed one branch of the controversy to the judicial arena, demanding that United comply with the terms of its direct sale contract and alleging that FPC lacked jurisdiction to curtail gas provided under direct sales contracts. The Supreme Court disagreed, holding that FPC's transportation jurisdiction[6] gave it power to curtail direct sales. FPC v. Louisiana Power & Light Co., 1972, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369.

---

5. United Gas Pipe Line Co. Environmental Impact Statement, Joint Appendix (J.A.) 1586, 1589.

6. "The provisions of this act shall apply to the transportation of natural gas in interstate commerce . . . ." Natural Gas Act, § 1(b), 15 U.S.C.A. § 717(b) (1963).

Furthermore, it held that the Commission could curtail under the simplified procedures of section 4 of the Natural Gas Act,[7] and that section 4 also would provide the antidiscriminatory standard by which FPC should judge curtailment plans.[8] The net result was that any curtailment plan that did not create an "undue preference" could be implemented almost immediately, without a hearing.

In FPC v. LP&L the Supreme Court had reached only the jurisdictional and procedural issues. Meanwhile, the battle over the merits of United's curtailment plan raged before the Commission. On March 31, 1971, United followed up its extension request with a petition in Docket No. RP71–99 asking for a declaratory order interpreting the substitute fuel clauses in its contracts with Mississippi Power & Light Company (MP&L), Mississippi Power Company (MPC), and International Paper Company (IP). Generally speaking, those clauses provide that when United cannot deliver gas, it must pay its customers the difference between the cost of gas and the

cost of the fuels they must burn in its absence.

As the winter heating season wore on, other pipelines experienced shortages.[9] To meet the widening problem head-on, the Commission on April 15 issued Order No. 431, a statement of general policy which directed pipelines expecting curtailment to take all necessary steps, including the filling of storage fields, to maintain an adequate supply of gas and to file proposed curtailment plans in the form of new tariff sheets. These tariffs, the order hopefully pronounced:

. . . control in all respects notwithstanding inconsistent provisions in sales contracts, jurisdictional and nonjurisdictional, entered into prior to the date of the approval of the tariff.

Order No. 431, 18 C.F.R. § 270(b)(7) (1971).

On May 17, 1971, United filed its response to Order No. 431 in Docket No. RP71–120, which proposed two changes in its tariff. First, it asked for a five-category curtailment [10] plan to replace

---

7. Under the procedures outlined in § 4(c), (d), and (e)

. . . a pipeline's tariff amendments filed with the FPC go into effect in 30 days unless suspended by the Commission. If a filing is challenged or the FPC of its own motion deems it appropriate, it may suspend the amended tariff for up to five months, at the end of which time the amended tariff becomes effective pending the completion of hearings. In these hearings, the pipeline has the burden of proving that its plan is reasonable and fair.

Order No. 431 makes full use of the § 4 procedures. All pipelines facing shortages necessitating curtailment are required to file reasonable allocation schemes as amendments to their existing tariffs, or to state that the existing tariffs are adequate. When emergency or other conditions arise and it appears desirable in the public interest to place a plan into effect, the FPC may accept the filing, implement it immediately or suspend it, and employ the plan as a working guideline while hearings continue. In addition to the flexibility of this arrangement, the requirement that pipelines submit plans enables the FPC to utilize each pipeline's unique knowledge of its customers' needs,

ability to substitute other fuel sources, and other relevant considerations.
FPC v. Louisiana Power & Light Co., 1972, 406 U.S. 621, 645, 92 S.Ct. 1827, 1840–1841, 32 L.Ed.2d 369.

8. Section 4(b) of the Natural Gas Act provides:

No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

15 U.S.C.A. § 717c(b) (1963).

9. See Comment, FPC Natural Gas Allocation: Curtailment in Context, 50 Texas L. Rev. 1370, 1394 (1972).

10. *Category I.* Domestic consumers of natural gas served directly or indirectly by Seller.

*Category II.* Industrial users of natural gas served directly by Seller, to the extent they use gas as a raw material in creating an end product rather than as (a) an

the three-category scheme. Second, it asked for a tariff provision absolving it from contractual liability arising from curtailment.[11]

### B. Opinions 606 and 606–A

The Presiding Examiner concluded forty-three days of hearings on Docket Nos. RP71–29 and RP71–120 on July 27.[12] On October 5, 1971, FPC issued its first opinion in the United affair, Opinion 606,[13] omitting the usual intermediate opinion by a hearing examiner in the interest of expedience. The winter heating season was approaching rapidly.

In Opinion 606 FPC addressed itself primarily to the jurisdictional issue, whether it had the power to curtail direct sales; it concluded it did have such jurisdiction. This conclusion was subsequently confirmed by the Supreme Court in FPC v. Louisiana Power & Light, *supra.*

The jurisdictional issue resolved, Opinion 606 then focused on the petitions filed by United in Docket Nos. RP71–120 and RP71–99. In RP71–120 United had responded to Order No. 431 with a proposed tariff revision that would expand the priority levels in its curtailment plan from three to five. FPC quickly rejected category V,[14] in which United had placed customers who were paying a comparatively low rate for their gas, and ordered United to file new tariffs with four priority levels.

So far Opinion 606 was on firm ground; then the Commission ventured further. The petition in RP71–120 had proposed a new tariff provision stating that no payments or credits for substitute fuels will be made or given in the event of curtailment.[15] RP71–99's petition had requested a declaratory order interpreting the substitute fuel clauses in United's contracts with IP, MPC, and MP&L.[16] The Commission declined to

---

agent for heating, cooling, dehydrating or otherwise affecting industrial process materials, or (b) for other industrial purposes.

*Category III.* Electric generating stations, whether served directly or indirectly by Seller, to the extent such stations serve domestic consumers of electricity.

*Category IV.* Users of Seller's natural gas, whether served directly or indirectly by Seller, to the extent not supplied under Categories I, II, and III, and to the extent not subordinated in Category V.

*Category V.* Those users of Seller's natural gas described in Categories II, III and IV who are served directly by Seller, but whose cost of gas purchased from Seller, at the time of determining relevant priorities hereunder, is less than such cost would be if determined in accordance with Seller's then effective rate schedule for sales for resale of gas in interstate commerce to city gate customers in Seller's applicable rate zone at a 100 per cent load factor.

United Gas Pipe Line Co. FPC Gas Tariff § 12, First Revised Sheet No. 71 and Third Revised Sheet No. 72, Docket No. RP 71–120 (May 14, 1971) (J.A. 1058, 1059).

11. Whenever Seller prorates its gas supply or interrupts its service in accordance

with this Section 12 of its Tariff so that customers of Seller do not receive the volumes of natural gas they desire up to their Maximum Daily Quantities, . . . Seller [shall not] be obligated to pay or credit such customers any sums with respect to substitute fuels burned by such customers during such a period of proration or interruption.

United Gas Pipe Line Co. FPC Gas Tariff § 12.3, Original Sheet No. 72–A, Docket No. RP 71–120 (May 14, 1971) (J.A. 1058, 1062).

12. FPC had consolidated Docket Nos. RP 71–29 and RP 71–120 on May 28, 1971. Notice of Filing and Order Suspending Proposed Revised Tariff Sheets, Consolidating Issues in Pending Proceeding and Scheduling Distribution of Evidence, Docket Nos. RP 71–29 and RP 71–120, United Gas Pipe Line Co. (May 28, 1971).

13. Opinion No. 606, Docket Nos. RP 71–29, RP 71–120, RP 71–99, United Gas Pipe Line Co., 46 FPC 786 (October 5, 1971).

14. *See* note 10, *supra.*

15. *See* note 11, *supra.*

16. Petition of United Gas Pipe Line Co. for Declaratory Order, Docket No. RP 71–99 (Mar. 31, 1971) (J.A. 1018). FPC held no hearings on No. RP 71–99, reasoning that it presented no evidentiary issues.

issue a declaratory order in RP71–99, or to endorse the tariff language requested in RP71–120, reasoning that exculpatory tariff and contract provisions were unnecessary.

Implementation of the curtailment plan itself, pursuant to our procedures, would be an *absolute defense* for United against all claims for specific performance, damages, or other requests for relief under these contracts affected by curtailments that may be initiated in the courts. No additional tariff language like that proposed in Section 12.3 . . . is necessary to limit liability under contracts when agencies' orders, rules, or regulations authorize actions contrary to those contracts. . ' . .

. . . . . . .

Therefore, the language in United's tariff precluding the operation of substitute fuel clauses when curtailments are properly implemented is unnecessary. (emphasis added)

United's customers objected to this language, and FPC responded with a "clarification" in Opinion 606–A.[17]

In clarification, this Commission has the responsibility and the authority to protect all consumers from efforts by pipelines to grant preferences in service to particular customers or classes of customers in times when gas shortage precludes fulfillment of all contracts for delivery of gas. A claim of preference in service directly or, in the case of substitute fuel clauses, indirectly, cannot operate to deprive this Commission of authority to assure fair and equitable curtailment plans. The pipeline companies cannot be faced with the dilemma of providing nondiscriminatory service as ordered by the Commission and at the same time incur liability for breach of contracts which grant discriminatory preferences, directly or indirectly. Thus, the Commission's authority to preclude undue preferences and discriminations in service operates to preempt any contract provisions inconsistent with the exercise of that authority as not being in the public interest.

This court reviewed Opinion 606 in International Paper Co. v. FPC, 5th Cir. 1973, 476 F.2d 121. By then the Supreme Court had decided FPC v. LP& L, removing the jurisdictional issue from this court's review. But FPC's attempt to insulate United from all contract liability was very much a live issue, and this court concluded that the attempt was "mere dicta . . . [having] no force other than to reflect a position taken by the FPC which lacks support in the record before it." 476 F.2d at 125. We have occasion more fully to discuss our reasoning in *International Paper* later in this opinion.

C. Opinions 647 and 647–A

Pursuant to Opinion 606 [18] the Presiding Examiner entered his initial decision on July 3, 1972. Some six months later, in January 1973, the Commission issued Opinion 647, which reviewed the Presiding Examiner's decision. The decision's multifaceted nature demands that we categorize its major holdings and discuss them separately.

1. *Immediate subordination of gas used as boiler fuel by utilities to generate domestically consumed electricity*

Until the new five-priority plan ordered by Opinion 647 is put into effect, the interim plan modified by Opinion 606 will determine United's curtailment

17. Opinion No. 606–A, Docket Nos. RP 71–29, RP71–120, RP71–99, United Gas Pipe Line Co., 46 FPC 1290, 1292–3 (Dec. 3, 1971).

18. In Opinion No. 606 FPC, without reaching the merits of United's curtailment plan, remanded the proceedings to the Presiding Examiner "for his initial decision regarding the proper interpretation and implementation of United's proposed curtailment plans, and the reasonableness thereof as set forth in both its petition for declaratory order, as amended and supplemented, in Docket No. RP 71–29, and its filing, as amended and supplemented, in Docket No. RP 71–120."

practices.[19] That plan gave electrical utilities' gas priority over some industrial uses of gas, putting the former in category III and the latter in category IV. Opinion 647 ordered United immediately to consolidate categories III and IV, but to permit electrical utilities to get emergency allocations of gas if necessary to avoid load shedding. The emergency allocations must be paid back. Thus we surmise the interim curtailment plan now in effect is:

> *Category I.* Domestic consumers of natural gas served directly or indirectly by Seller.

> *Category II.* Industrial users of natural gas served directly by Seller, to the extent they use gas as a raw material in creating an end product rather than as (a) an agent for heating, cooling, dehydrating or otherwise affecting industrial process materials, or (b) for other industrial purposes.

> *Category III.* Users of Seller's natural gas, whether served directly or indirectly by Seller, to the extent not supplied under Categories I and II.

### 2. *Approval of United's past curtailment efforts.*

In his initial decision the Presiding Examiner confined his attention to United's latest proposed (four-level) tariff, and did not concern himself with its past programs or practices. The Commission took a broader view of its task and felt impelled to pass upon the "justness and reasonableness" of United's past plans[20] and approve its past curtailment practices. Some United customers had charged that United provided new or enlarged service at a time when it knew that the gas shortage would soon make it impossible to continue the new service without injuring the "old" customers. The Commission concluded that United had not acted "improvidently" in increasing its deliveries with knowledge of the shortage; all the increases were required by contracts entered into before the shortage materialized, and some of the increased sales had been certificated by the FPC. The Commission found no evidence that United had attempted deception in asking for the certification. It concluded that United was not guilty of any deliberately discriminatory conduct. Therefore it concluded that the tariff curtailment provisions in Docket Nos. RP71–29 and RP71–120, and United's implemental actions, were just and reasonable.

### 3. *Deletion of tariff language disclaiming contract liability stemming from curtailment.*

In Docket No. RP71–120 United proposed a new section in its tariff, section 12.3, that would, *inter alia,* remove any obligation United might have to pay for substitute fuels during curtailment.[21] In Opinion 606 FPC called this provision "unnecessary" because, in its view, compliance with a curtailment plan would provide an absolute defense in any damage suit.

19. *Category I.* Domestic consumers of natural gas served directly or indirectly by Seller.
*Category II.* Industrial users of natural gas served directly by Seller, to the extent they use gas as a raw material in creating an end product rather than as (a) an agent for heating, cooling, dehydrating or otherwise affecting industrial process materials, or (b) for other industrial purposes.
*Category III.* Electric generating stations, whether served directly or indirectly by Seller, to the extent such stations serve domestic consumers of electricity.
*Category IV.* Users of Seller's natural gas, whether served directly or indirectly by Seller, to the extent not supplied under Categories I, II, and III.
United Gas Pipe Line Co. FPC Gas Tariff § 12.1, Second Revised Sheet No. 71 (Oct. 15, 1971) (J.A. 1223, 1224).

20. In Opinion 647 the Commission passed on the "justness and reasonableness" of three past curtailment programs: a three-priority plan in effect from November 1, 1970 through March 31, 1971; a three-priority plan in effect from April 1, 1971 through October 31, 1971; and a four-priority plan implemented from November 1, 1971 through January 12, 1973.

21. *See* note 11, *supra.*

In Opinion 647 the Commission reiterated that view and went on to order the language deleted. Shortly after Opinion 647 appeared, however, this court published its decision in International Paper Co. v. FPC, *supra*, which called FPC's "absolute defense" theory pure dicta. The Commission replied to *International Paper* in Opinion 647–A, issued May 30, 1973. There it asserted United faced no potential general contract damage liability because its management, in commencing new service with the shortage close at hand, had not been guilty of improvidence or willful misconduct. In any event, United faced only minimal potential liability from its substitute fuel clauses because the maximum period of exposure was a short seven days.[22] Therefore it again concluded that section 12.3's protection was unnecessary.

4. *Promulgation of a new curtailment plan.*

Opinions 647 and 647–A rejected United's proposed four-level curtailment plan in favor of a five-level plan adopted from the *Arkansas Louisiana Gas Co.* proceedings.[23] Opinion No. 643, Docket No. RP71–122, Arkansas Louisiana Gas Co., 49 FPC 53 (Jan. 8, 1973). The five categories as adopted are as follows:

I. Residential and small commercial (less than 50 Mcf on a peak day).

II. Large commercial requirements (50 Mcf or more on a peak day); industrial requirements for plant protection, feedstock and process needs; pipeline customer storage injection requirements; firm industrial sales up to 300 Mcf per day; and emergency electric generation requirements.

III. Industrial requirements not specified in priorities 2, 4 and 5; direct and indirect interruptible requirements up to 300 Mcf per day, and direct and indirect interruptible requirements above 300 Mcf per day where alternate fuel capability cannot meet such requirements.

IV. Industrial requirements for boiler fuel use at less than 3,000 Mcf per day, but more than 1,500 Mcf per day, where alternative fuel capabilities can meet such requirements.

V. (A) Industrial requirements for large volume (3,000 Mcf or more per day) boiler fuel use where alternative fuel capabilities can meet such requirements.
(B) All direct and indirect interruptible requirements of 300 Mcf or more where alternate fuel capabilities can meet such requirements.

22. This maximum seven-day exposure stemmed, the Commission believed, from language in the substitute fuel clauses limiting United's liability for fuel oil use to *"not more than seven consecutive days."* Opinion No. 647–A, Docket Nos. RP 71–29, RP 71–120, United Gas Pipe Line Co. para. 30 and n. 32 (May 30, 1973); J.A. 1534.

23. The *Arkla* plan has eight priority levels. The basic difference between that plan and the one set out in Opinion 647 is that the latter dispensed with the last three categories.
*Priority 1.* Residential, small commercial (less than 50 Mcf on a peak day).
*Priority 2.* Large commercial requirements (50 Mcf or more on a peak day) and industrial requirements for plant protection, feedstock and process needs.

*Priority 3.* All industrial requirements not specified in Priorities 2, 4, 5, 6, 7 or 8.
*Priority 4.* Firm industrial requirements for boiler fuel use at less than 3,000 Mcf per day, but more than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.
*Priority 5.* Firm industrial requirements for large volume (3,000 Mcf or more per day) boiler fuel use where alternate fuel capabilities can meet such requirements.
*Priority 6.* Interruptible requirements of less than 1,500 Mcf per day.
*Priority 7.* Interruptible requirements of intermediate volumes (from 1,500 Mcf per day through 3,000 Mcf per day).
*Priority 8.* Interruptible requirements of more than 3,000 Mcf per day.

Generally speaking, this plan alters United's four-level proposal by downgrading the priorities enjoyed by large commercial users (formerly category I) and utilities generating electricity for domestic consumption (formerly III); by distinguishing between firm and interruptible customers; by introducing the ability to burn alternate fuels as a distinguishing factor; and by removing the distinction between direct and indirect customers.

The Commission also altered features other than the priority structure. It eliminated the flat 3,000 Mcf/day exemption formerly enjoyed by United's industrial customers. It deleted the growth factors which had permitted city gate and power plant customers to expand their base requirements each year, and it established summer 1972 as the benchmark for their permanent base requirements. It accorded storage injections priority II, above the industrial customers.

The Commission remanded the new plan for hearings that will develop information necessary to its implementation. On remand the Administrative Law Judge was directed to consider the parties' allegations of possible adverse environmental impact the new plan would have; to determine the impact the plan would have on United's customers by calculating the volumes of gas used for each particular end use by the direct and indirect customers; and to consider United's plan for husbanding its reserves. At oral argument it was asserted that these hearings will not be complete for six months to one year,[24] and FPC ultimately felt it necessary to delay implementation of the five-category plan until the hearings were concluded.

5. *Refusal to file an environmental impact statement.*

Section 102(C) of the National Environmental Policy Act, 42 U.S.C.A. § 4332(C) (1973), requires every federal agency "to the fullest extent possible," to

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

In Opinion 647 FPC took the position that an environmental impact statement is never required for its approval of curtailment plans. It reasoned that such plans are mere contingency plans which may be invoked to a great extent, to some extent, or not at all. FPC cannot know what classes of users will be curtailed in the future or to what extent. It cannot know what the condition of the atmosphere will be when curtailment does occur. It cannot know what substitute fuels will be available. In other words, it feels that curtailment plans involve so many variables that an environmental impact statement would be built upon sheer speculation and thus would be a waste of time and energy. *See* Order Denying Motion to Terminate Proceeding and to Require Staff to Prepare and Circulate Environmental Impact Statement, El Paso Natural Gas Company, Docket No. RP72–6, 48 FPC 371 (Aug. 22, 1972).

24. Oral argument transcript at 7.

We shall discuss these five aspects of Opinions 647 and 647–A one by one.

## III. Immediate Subordination of Gas Used for Generating Domestic Electricity

### A. The Effect of Opinion 647

Before FPC promulgated Opinions 647 and 647–A United followed an interim four-priority curtailment plan which placed at level III gas used to generate domestically consumed electricity; all gas not curtailed in the first three levels was at level IV. Opinion 647 merged levels III and IV to create a new interim plan.

 Similarly, the permanent curtailment plan set out in Opinion 647 would put all large-scale use of gas for boiler fuel in the fifth of five categories. By ordering such gas immediately placed in the bottom category FPC effected partial implementation of the final curtailment plan. Alternatively, one might view the revision as an integral part of a currently effective interim curtailment plan. Either way it is reviewable here. *See* American Smelting and Refining Co. v. FPC, D.C.Cir. 1974, 494 F.2d 925. The rest of the permanent curtailment plan's priority structure has been remanded by FPC for further hearings. See part VII of this opinion.

In Opinion 647 FPC articulated no reasons for lowering the priority of gas burned for domestically consumed electricity. Presumably its reasons for so doing are the reasons it gave for subordinating boiler fuel generally; but those reasons are likewise absent from Opinion 647. The opinion appears to adopt the reasoning of Opinion 643.

In Opinion 643, issued January 8, 1973, prescribing a curtailment plan for Arkansas Louisiana Gas Company, we set forth an order of priorities having general applicability. Our reasons therefor are set forth at length in Opinion 643 and need not be restated here. We have likewise made clear our position on the use of gas as a boiler fuel.

49 FPC at 189.

Opinion 643 gives the following rationale for downgrading boiler fuel as an end use.

. . . [W]e commit ourselves to the proposition that large volume boiler fuel usage is inferior and should be curtailed before other firm service. Aside from the established physical fact that combustion of natural gas for raising steam in boilers and its subsequent conversion into electricity or mechanical energy results in a loss of roughly two-thirds of the heating value of the gas used—which we regard as unacceptably inefficient in times of shortage—we note also that those who use gas as boiler fuel generally can substitute other fuels more readily and at lower overall cost than other gas users; additionally, pollution control is more practical because of the large size of individual installations. Other fuels generally can be physically substituted in large boiler fuel applications with less inconvenience and less possible adverse consequences than in other industrial applications, such as direct fired uses, and other uses demanding precise temperature control, flame characteristics, instantaneous response and atmosphere quality. Finally, subordinating boiler fuel use with its comparative ease of substitutability, to other large scale industrial and commercial uses should tend to minimize plant and business closings and the attendant economic loss from decreased production and payrolls, and the personal hardships of unemployment.

49 FPC at 66–67.

Thus the Commission gave four reasons for concluding that, in the context of curtailment, gas for boiler fuel should be relegated to an inferior status.

(1) Boilers make relatively inefficient use of gas.

(2) Other fuels can substitute for gas as a boiler fuel more easily and satisfactorily than they can sup-

plant gas in other industrial applications.

(3) It is easier to control the pollution emanating from boilers than from other industrial processes.

(4) Because other fuels are available to run boilers, curtailment of boiler fuel gas will be economically less disruptive than curtailment of gas for other industrial or commercial applications.

### B. The Complaints

■ By immediately relegating boiler fuel gas to the bottom category of United's interim curtailment plan the Commission engaged in curtailment on the basis of end use. In its view boilers make an "inferior" use of natural gas. The State of Louisiana argues that the Commission lacks authority to curtail on the basis of end use. However, if FPC were restricted to curtailing on the basis of contract rights, contract rights would enjoy protection while human needs might be disregarded. Such a restriction would be inconsistent with the Commission's broad statutory authority to protect the public interest. *See generally* FPC v. Louisiana Power & Light Co., 1972, 406 U.S. 621, 92 S.Ct. 1827, 32 L. Ed.2d 369. We prefer to follow the D.C. Circuit in its conclusions that end-use curtailment is within FPC's statutory authority and that end use is a "most appropriate consideration for purposes of a curtailment plan." American Smelting and Refining Co. v. FPC, D.C. Cir. 1974, 494 F.2d 925 at 936. Therefore we will approve FPC's modification of the four-priority plan if it is supported by findings, reasons, and substantial evidence, and if it is necessary to bring the plan in line with the Natural Gas Act.

Some parties argue that FPC's decision to downgrade boiler gas is procedurally defective because Opinion 647 contains no findings or reasons to support it, and FPC should not be permitted to depend on the findings and reasons in a separate opinion, No. 643. In their view even if we accept Opinion 643's findings and reasons, the record underlying Opinion 647 does not contain substantial evidence to support them. LP&L argues that FPC lacks power to revise a curtailment plan without finding it inadequate under the Natural Gas Act's section 4(b). Other arguments are mainly technological. These point out that some industries make efficient use of boiler gas, unlike the utilities; it is unfair to lump all boiler gas in the same low category. And FPC erroneously assumed that oil is easily substituted for gas as a boiler fuel; in fact some utilities can burn oil only for short periods of time if at all, due to equipment limitations. Yet another argument maintains that downgrading utilities' gas is inconsistent with FPC's stated goal of giving high priority to gas burned to satisfy "human needs"; [25] gas burned to generate electricity ultimately supplies many families with light and heat, thus satisfying unquestionably basic human needs. Finally, one party argues the Commission's action violates its duty under the Federal Power Act to assure the country of an "abundant supply of electric energy." [26]

■■ In our view the only meritorious arguments against the Commission's action are the contentions that it may not be supported by findings, reasons, and substantial evidence, and that it should have been based on a finding of "illegality." While the practice of adopting another opinion's findings and reasons sometimes may produce an unclear result, we think Opinion 647 makes the adoption in terms clear enough to avoid confusion. The argument that some industrial boiler uses of gas are efficient fails to meet FPC's objection that precious natural gas should not be

---

25. *See* Order No. 467, Docket No. R–469, Utilization and Conservation of Natural Resources—Natural Gas Act: Statement of Policy (Jan. 8, 1973).

26. 16 U.S.C.A. § 824a(a) (1960).

used when other fuels can do the same job. If boilers can be run on less precious fuels, then natural gas should be diverted to more specialized uses. That some companies cannot burn substitute fuels for a substantial length of time is immaterial; FPC desires that they build facilities that have such a capability.[27] And the Commission does not ignore the importance of domestic electricity; it permits utilities to ask for emergency allotments in times of drastic shortages. The domestic consumer's human needs will be fulfilled if at all possible. Last, by seeking to encourage the generation of electricity by non-gas means, FPC does not violate any duty to assure an adequate supply of electricity. The opposite is true; the low gas supply demands that utilities seek alternate generation methods. Next we examine the argument that FPC's reasons and findings are not supported by substantial evidence.

## C. FPC's Reasons Reviewed

1. *Ease of pollution control and minimization of curtailment's economic impact.*

We shall discard these two reasons for lack of evidentiary support. The first, ease of pollution control, appears to be entirely without record support. We have no way of knowing how the Commission arrived at its conclusion that boiler pollution is more easily abated than that from other industrial processes.

The second, minimization of curtailment's economic impact, is premised on the notion that it is easier to find substitute fuels for boilers than for other industrial systems. Since this reason depends on the validity of another rea-

son (availability of alternate fuels), it adds no support to FPC's decision and we shall discard it.

2. *Inefficiency.*

FPC's conclusion that boiler use is relatively wasteful of gas is supported by record testimony that space heating using electricity generated by gas requires two to three times as much gas as heating by gas burned on the premises.[28] Given the paucity of natural gas, it follows that the Commission correctly concluded that gas should be burned in a manner that better utilizes its potential energy. We recognize that FPC's energy loss argument may not speak to all boiler fuel uses of gas. The next reason applies to the more efficient boiler uses of gas.

3. *Availability of substitute fuels.*

It is obvious, as the Commission concludes, that if gas is in short supply, and thus at a premium, more plentiful fuels should be burned wherever possible in order to save natural gas for functions which cannot utilize a substitute. Therefore the Commission subordinated gas used as boiler fuel because alternate fuel sources are more readily available for boilers than for other industrial processes. The evidence to support that reasoning falls in two categories.

(a) Evidence showing oil is (or can be) used in existing boiler facilities.

Record testimony by utility representatives showed that some companies have an ability to burn fuel oil in their boilers. Gulf states can burn oil in generating units at two plants.[29] Louisiana Power and Light has eight generating units which can burn oil on an emergen-

---

27. In FPC's view a plant has an alternate fuel capability if an alternate fuel *could* perform the job being done by gas even though the alternate facility has not yet been constructed. This point is made clear by FPC's definition of alternate fuel capability. "Alternate Fuel Capabilities: Is defined as a situation where an alternate fuel could have been utilized whether or not the facilities

for such use have actually been installed." Opinion 647–A, Appendix A at 24. The purpose of this definition is to encourage those who can to convert to alternate fuels, even if they have to build new facilities. *See* oral argument transcript at 128.

28. J.A. 3186.

29. J.A. 2747.

cy basis for up to sixty-five hours. Another LP&L unit can burn oil for seven days.[30] Mississippi Power and Light's Greenville plant upon completion was predicted to be able to burn fuel oil continuously.[31] At the time of the hearing MP&L had four generating units capable of "split-firing" (burning a combination of oil and gas) on an emergency basis.[32] New Orleans Public Service, Inc. (NOPSI) has two generating units which can split-fire for three to five days at a time, and perhaps longer.[33] One plant belonging to the South Mississippi Electric Power Association has operated "on a split-fired basis." [34]

(b) Evidence showing projected oil-burning boiler facilities.

Besides present oil-burning facilities, the record also shows that new facilities were being planned. Testimony showed that NOPSI expected to have most of its generating units converted so that they would have the capability of oil-burning by spring 1972.[35] NOPSI had a plan to convert all its major generating units or major boilers to burn oil.[36] Gulf States had employed a consultant to develop a construction schedule and cost estimate for converting "certain" Gulf States facilities to continuous full oil use.[37]

4. *Conclusion.*

■ While this issue is not without difficulty, we believe that the conclusions reached by the Commission are reasonable. We find that the evidence discussed above, together with all other factors including the Commission's expertise, is sufficient to support conclusions that fuels other than gas can run boilers and that, because gas is in short supply, gas for boilers should be accorded low priority to encourage the use of those alternate fuels. Therefore the Commission's order requiring immediate subordination of gas used to generate

domestic electricity has enough evidentiary support to pass muster, especially in light of the availability of emergency allotments to protect electrical consumers. The conclusions of the Commission must be, to some extent, on a trial and error basis and are, of course, subject to change at any time should FPC determine that there must be a relaxation of substitution requirements.

However, our approval of FPC's evidence and reasoning is not unqualified. First, we wish to emphasize that here we review only the interim subordination of gas for domestic power generation. At this time we do not pass on the priority scheme contained in the permanent curtailment plan. Second, if a court reviews the permanent plan at a later date, findings and record evidence on several critical points would be helpful.

One of FPC's basic tenets underlying its treatment of boiler fuel gas is that, compared to other industrial devices, boilers are more readily converted to substitute fuels such as oil. The evidence indeed showed that boilers can be so converted; but it does not give the slightest indication why other industrial processes and devices cannot also be converted. And if they also can be converted, how difficult is the conversion? Why are boilers easier to convert?

The Commission grounds its treatment of boiler fuel on an assumption that boiler owners have at their fingertips a ready supply of fuel oil to be used upon conversion. But Opinion 647 was released in January 1973; we take judicial notice of the oil shortage that has plagued this country in the interim. In view of this oil shortage, is it valid to assume boiler owners have a ready substitute fuel source? If they do not, then the Commission might be wise to consider a plan that does not accord boil-

30. J.A. 5084–5.
31. J.A. 5905–6.
32. J.A. 5015.
33. J.A. 5318.
34. J.A. 2972.
35. J.A. 5274.
36. J.A. 5317.
37. J.A. 2574–5.

er fuel a lower priority than other equally essential industrial uses. In other words, a plan like the original United three-priority plan might be better suited to a situation in which fuel oil is not readily available.

If oil is in short supply, power plants (and others who use boilers) may be forced to look to coal as an alternative fuel source. Opinion 647 obviously is intended to encourage the building of new, non-gas burning energy generation facilities.[38] One such facility would be a coal-burning plant. Since that is one of the predictable alternatives toward which Opinion 647 may push United's customers, it would be helpful to have evidence and a finding concerning its feasibility in the states served by United.

### D. FPC's Authority

■ While the record contains enough evidence to support FPC's interim downgrading of boiler fuel, we are of the opinion that that action was outside the Commission's statutory authority. Therefore we must vacate that part of Opinion 647 and order the reinstatement of the four-level plan in force when Opinion 647 was issued.

The difficulty is this: FPC approved the interim four-level plan as "just and reasonable," and in the next breath it ordered a new, three-level plan to take its place. Such action ignores the fact that when FPC holds a hearing and orders a new curtailment plan, or revises an old one, it is exercising authority granted by section 5(a) of the Natural Gas Act. American Smelting and Refining Co. v. FPC, D.C.Cir. 1974, 494 F.2d 925.

> Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by

any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order

· · · ·

15 U.S.C.A. § 717d(a) (1963).

Under that section, however, before FPC can issue a remedial order it must find that the existing curtailment plan is "unjust, unreasonable, unduly discriminatory, or preferential." *American Smelting and Refining Co., supra.* Since such a finding was absent in regard to the four-priority plan in force when Opinion 647 was issued, FPC lacked authority to modify the plan by requiring United to file new tariff sheets.

FPC can remedy this problem on remand by re-examining the four-level plan in light of the standards in section 4(b) of the Natural Gas Act. Until that time, however, the four-level plan must remain in force.

■ To summarize, the record would contain enough evidence to support FPC's interim action in subordinating gas for domestic power generation if FPC had had statutory authority to take that action. However, it lacks that authority unless it finds that the four-priority plan fails in some way to meet section 4(b) standards. Furthermore, more evidence is necessary to support Opinion 647's placement of large boiler fuel use in the fifth of five categories in the permanent curtailment plan. To that end the docket in RP71–120 should be reopened on remand to consider (1) the difficulty of using substitute fuels in industrial systems other than boilers; (2) the current availability of fuel oil;

---

38. *See note 27, supra.*

and (3) the feasibility of constructing coal-powered plants in the states served by United.

## IV. Approval of United's Curtailment Efforts Prior to Opinion 647

Monsanto charges that United helped create the shortage by taking on new service commitments with knowledge of its dwindling supplies. The net result has been a reduction in the amount of gas presently going to United's older customers; gas they should be receiving instead is going to meet United's new commitments. In addition Monsanto alleges isolated instances in which United practiced favoritism among its customers by failing to curtail consistently.[39] In Opinion 647 the Commission approved United's actions, and the issue is before us on appeal. In our view, however, this branch of the case is unreviewable.

### A. Background

For sixteen years prior to United's first curtailment in 1970, its tariff contained a contingency plan to be used if curtailment became necessary. Its direct sales contracts similarly contained impairment-of-delivery provisions. When United realized in the fall of 1970 that curtailment was unavoidable, it also discovered that some of its customers were most unhappy with the prospect of a suddenly undependable gas supply.[40] In an effort to thwart the dissidents at an early stage, in October 1970 United filed a Petition for Declaratory Order, Docket No. RP71–29. The petition sought an order declaring that the curtailment plan scheduled to go into effect in a few days was consistent with the program outlined in United's tariff and contracts. United and its customers reached a settlement agreement permit-

ting United to follow that plan through March 1971. Before long, however, United realized that more curtailment would be necessary, and consequently it filed a Supplemental Petition for Declaratory Order[41] asking that FPC also declare its slightly different summer plan consistent with its tariff and contracts. Both these plans provided for three priority levels, and both were put into practice.

Soon United decided it was time to change to a five-level curtailment plan. It drew up such a plan and filed it in new tariff sheets which FPC suspended and assigned Docket No. RP71–120.[42] FPC in Opinion 606 modified the plan by subtracting one level; the plan went into effect in November 1971 and was used until Opinion 647 appeared in January 1973. That opinion reduced the plan's priority levels to three by downgrading boiler fuel gas.

### B. Opinion 647

In response to Monsanto's charge that United had acted discriminatorily and violated section 4(b)[43] with its untimely expansion of service and its inconsistent curtailment practices, FPC addressed the justness and reasonableness of United's past curtailment programs and practices.

> In reviewing the objections to United's implementation of its curtailment program, we fail to find any instances of deliberately discriminatory conduct on the part of United. We find United's tariff curtailment provisions in Docket No. RP71–29, as later modified in Docket No. RP71–120, pursuant to which it implemented curtailment to be just and reasonable under the conditions then obtaining on United's system. Moreover, we are not persuaded by the arguments that United improv-

---

39. J.A. 1343 ff.

40. Petition of United Gas Pipe Line Co. for Declaratory Order, Docket No. RP71–29 (Oct. 26, 1970) (J.A. 984).

41. Supplemental Petition for Declaratory Order, Docket No. RP71–29, United Gas Pipe Line Co. (Feb. 22, 1971) (J.A. 1013).

42. Notice of Filing and Order Suspending Proposed Revised Tariff Sheets, Consolidating Issues in Pending Proceeding and Scheduling Distribution of Evidence, note 12, *supra*.

43. Natural Gas Act § 4(b), 15 U.S.C.A. § 717c(b) (1963).

idently enlarged its service to certain customers and that it should therefore bear responsibility for the gas shortage on its system. There is no doubt that United would have been willing to fulfill all of its requirements if the gas supply had been available. Under the circumstances, we find that United is not responsible through improvidence for its inability to meet its system requirements. Our primary concern now is that the available resources be distributed in accordance with just and reasonable priorities. 49 FPC at 188.

### C. Reviewability

■ At this point it is helpful to recall that United's petition in Docket No. RP71–29 sought a ruling that its interim three-priority curtailment plan was consistent with its tariff and contracts. But that plan and its summertime version were abandoned at FPC direction in November 1971,[44] well before Opinion 647 appeared in January 1973. Therefore the justness and reasonableness of both plans became a moot question. In fact the parties never asked for a determination of the plans' justness and reasonableness; United's petitions in No. RP71–29 asked only for declarations that the plans were consistent with United's tariff and contracts, an issue never addressed by FPC. Since FPC addressed a moot question not properly before it, we vacate its findings that the two three-priority plans were just and reasonable.[45]

■ While United's past curtailment plans are unreviewable because of mootness and irrelevance, its past curtailment actions present ripeness problems. The tariff sheets United first filed in Docket No. RP71–120 proposed a perma-

nent five-level plan. In Opinion 606 FPC reduced the levels to four; shortly thereafter the plan was put into effect on an interim basis while the Administrative Law Judge and then FPC pondered its merits as a permanent plan. Opinion 647 discarded the four-priority plan in favor of the five-priority plan borrowed from the Arkla proceedings. Thus ever since United first proposed a five-level permanent plan in No. RP71–120 it has been FPC's task to approve it, modify it, or formulate its own permanent plan. It chose the last alternative. Because the whole point of these proceedings has been to formulate a permanent curtailment plan for United, United's past curtailment conduct, as distinguished from its curtailment plans, is relevant only insofar as it affects the amount of gas customers will receive under the new permanent plan.

To illustrate, Monsanto claims that the effect of United's past curtailment practices continues to be felt today and will be preserved in the new five-level plan. By preserving the present effects of past discrimination, the new plan arguably creates undue preferences banned by section 4 of the Natural Gas Act. For example, Monsanto alleges that United should not have permitted city gate customers and power plant customers to have three and eight percent annual increases respectively in their base volumes. Those increases over a period of three years have given favored customers a sizeable advantage. The new five-level plan will perpetuate that advantage by calculating their entitlements on the basis of the expanded base volumes. To cite another example, Monsanto claims that United should not have expanded its service to certain customers when it knew the gas shortage would force curtailment of its present commit-

44. Opinion 606 directed United to omit category V of its proposed five-level plan and file new tariff sheets. United did so, and its four-level plan went into effect in November 1971.

45. Later in this opinion we point out that there was an issue in regard to the "just-

ness and reasonableness" of the four-level plan instituted in November 1971. A finding that the plan violated § 4(b) was a prerequisite to FPC's instituting a new or revised curtailment plan.

ments. Since the new plan divides the available gas among all of United's customers on the basis of historical usage, these "newcomers" will share equally with United's old customers. Consequently Monsanto asks that the new curtailment plan treat the new commitments on an interruptible basis, thus giving them a priority inferior to the old customers.

Since these past curtailment practices are relevant to the justness of the new proposed permanent curtailment plan, they should be judicially reviewed along with that plan. As we explain in part VI of this opinion, we decline to review the plan until FPC has completed the current hearings and decided to put it into effect. Therefore we also postpone our review of FPC's treatment of United's past curtailment practices.

 We would find it helpful if, on remand, the Commission would alter its focus slightly. It should ask whether United's past curtailment practices may have created undue preferences which the new plan will continue. In pursuing that inquiry, FPC could assist the court if it would define what it believes is meant by the phrases "undue preference or advantage," and "undue prejudice or disadvantage," which are the section 4 standards by which curtailment plans are evaluated. For example, is it not possible that even though United's contractual commitments to enlarge its service predated the gas shortage, its enlargement with knowledge of the shortage may have created an undue preference vis a vis the older customers? Certainly the Commission can set aside any contractual provision creating an undue preference. How, then, can a contract's existence mean that a preference is not undue? FPC should bear in mind that the question here is not whether United should "bear responsibility for the shortage on its system"; rather it is who should get the gas that

is now available. FPC seems to have been concerned with deciding the issue of United's culpability. It would seem to us that that question should be resolved in a damage suit. Arguably determinations of fault and culpability are not necessary to finding a preference undue, but we will not rule on that issue until we have had the benefit of FPC's views.

To summarize, FPC must answer two questions in regard to United's past curtailment plans and practices. Did the four-priority plan instituted in November 1971 meet the standards of section 4(b) of the Natural Gas Act? Did United's past curtailment practices create undue preferences (or other section 4(b) discrepancies) that will be carried forth in the proposed permanent curtailment plan?

## V. Deletion of the Proposed Tariff's Exculpatory Provision

As part of the curtailment plan proposed in Docket No. RP71–120 United added this language to section 12.3 of its tariff:

> . . . nor shall Seller be obligated to pay or credit such customers any sums with respect to substitute fuels burned by such customers during such a period of proration or interruption.[46]

Thus the suggested provision would absolve United of any liability for the excess cost of substitute fuels, whether the liability arose from substitute fuel clauses or from general contractual commitments to supply its customers.

This exculpatory provision was at least partially inspired by a controversy over the proper interpretation of substitute fuel clauses in United's contracts with MP&L, Mississippi Power, and International Paper.[47] We shall discuss these clauses in more detail below. For now it is sufficient to say that United interprets them to impose liability for

---

46. United Gas Pipe Line Co. FPC Gas Tariff § 12.3, Original Sheet No. 72–A, Docket No. RP71–120 (May 14, 1971) (J.A. 1058, 1062).

47. The substitute fuel clause in United's contract with International Paper is reproduced in full in International Paper Co. v. FPC, 5th Cir. 1973, 476 F.2d 121, 123, n. 1.

only seven days of "any given curtailment" [48] while its customers believe United's exposure is considerably broader. To settle this dispute early in the game, United asked for a declaratory order narrowly construing the obligations imposed by its substitute fuel clauses.[49] FPC consolidated the declaratory order petition (RP71–99) with Docket No. RP71–29 [50] and thus treated United's proposed tariff liability disclaimer and declaratory order request at once in Opinions 606 and 606–A.

### A. Opinions 606 and 606–A

In these opinions FPC declined either to interpret United's substitute fuel clauses or to add section 12.3's protective insulation. FPC reasoned that neither step was necessary because:

> Implementation of the curtailment plan itself, pursuant to our procedures, would be an absolute defense for United against all claims for specific performance, damages, or other requests for relief under these contracts affected by curtailments that may be initiated in the courts. No additional tariff language like that proposed in Section 12.3 . . . is necessary to limit liability under contracts when agencies' orders, rules, or regulations authorize actions contrary to those contracts.

Opinion No. 606, Docket Nos. RP71–29, RP71–99, and RP71–120, United Gas Pipe Line Co., 46 FPC 786, 805 (Oct. 5, 1971). Later the Commission expanded its rationale:

> . . . the Commission's authority to preclude undue preferences and discriminations in service operates to preempt any contract provisions inconsistent with the exercise of that authority as not being in the public interest.

Opinion No. 606–A, Docket Nos. RP71–29, RP71–99, and RP71–120, United Gas Pipe Line Co., 46 FPC 1290, 1293 (Dec. 3, 1971). Accordingly the Commission dismissed the petition in Docket No. RP71–99; it did not, however, order section 12.3 deleted from the proposed tariff.

### B. Opinion 647

Having no reason to doubt the approach taken in Opinions 606 and 606–A, in Opinion 647 the Commission simply reiterated its view that section 12.3's absolution was unnecessary.

> On the question of United's contract liability, on the basis of its curtailment activities, we indicated in Opinion No. 606 that implementation of a curtailment plan approved by the Commission would be an absolute defense and that language to that effect was not necessary in the tariff.

Opinion No. 647, Docket Nos. RP71–29, RP71–99, and RP71–120, United Gas Pipe Line Co., 49 FPC 179, 193 (Jan. 12, 1973). In the same opinion FPC ordered the deletion of section 12.3's words of absolution. Shortly thereafter, however, this court found inadequate the pronouncements in Opinions 606, 606–A and 647.

### C. International Paper

On February 7, 1973, this court decided International Paper Co. v. FPC, 5th Cir. 1973, 476 F.2d 121. There we reviewed those parts of Opinions 606 and 606–A which declared that an FPC curtailment order would be an "absolute defense" against curtailed customers seeking damages. We concluded that the "absolute defense" language was "mere dicta" having "no force other than to reflect a position taken by the FPC which lacks support in the record before it." 476 F.2d at 125.

Having decided that the language was dicta, we attempted to set forth the flaws in FPC's cursory announcement

---

48. Petition of United Gas Pipe Line Co. for Declaratory Order, Docket No. RP71–99 (Mar. 31, 1971) (J.A. 1018).

49. *Id.*

50. Order Consolidating Proceedings and Permitting Interventions, Docket Nos. RP71–29 and RP71–99, United Gas Pipe Line Co. (Sept. 15, 1971).

that curtailment orders provide automatic liability insulation. We inferred that FPC saw two avenues of absolution created by curtailment orders. First, a gas supplier could raise the defense of "impossibility of performance due to intervening governmental order." 476 F.2d at 125. But it was our view that the supplier nonetheless *might* be held liable, and that the question preferably should be resolved "in the court in which the issue is directly presented in the context of an actual controversy." *Id*. at 126.[51]

The second form of insulation adverted to by FPC was its claimed power to abrogate private contracts to protect the public interest from undue preferences. This pronouncement we found to be an unsupported conclusory statement. We said that if FPC desired to abrogate a substitute fuel clause it should examine it individually to see if its bargaining history showed a preference that truly was undue. Furthermore, we asked that FPC support with findings and reasons its view that the public interest required abrogation of these clauses. The findings and reasons should show why insulation from damages would be in the public interest.

In short we declined to affirm those portions of Opinions 606 and 606–A which declared liability insulation to be an automatic concomitant of curtailment orders. The issue was remanded for further consideration and fuller treatment. FPC's response came in Opinion 647–A, issued May 30, 1973.

D. Opinion 647–A

In Opinion 647–A the Commission sought once more to articulate its reasons for deleting section 12.3 from United's tariff. As we interpret that opinion, the reason for deletion is that United's potential contract liability is so slight that tariff protection is unnecessary. In FPC's view, United faces no potential liability for general breach of contract suits, and minimal liability from suits based on its substitute fuel clauses.

In regard to general damage liability for breach of contract, FPC reasoned that United would be vulnerable if its need to curtail resulted from its own negligence, bad faith, or other wrongful conduct.[52] But the Commission found that United could not be held liable on its contracts because it had not acted "improvidently."

> . . . we have neither the power nor desire to adjudicate United's contract liability, for as recognized in *International Paper*, that is within the province of the appropriate court. However, on the basis of the record in this proceeding, we must reaffirm our conclusion in Opinion 647–A . . . that United has not been guilty of any improvidence or willful misconduct in its actions.

Opinion 647–A, Docket Nos. RP71–29 and RP71–120, United Gas Pipe Line Co. (May 30, 1973) at 13. With no exposure to liability, section 12.3 was unnecessary. Thus while FPC disclaimed any intention of determining United's contract liability, it announced that an exculpatory tariff provision would be unnecessary because United faced no contract liability.

As for the substitute fuel clauses, the Commission found that they required United to reimburse its customers for the extra cost of substitute fuel only for "a maximum of seven days." Opinion 647–A, *supra*. In its view such minimal liability created no need for tariff protection; again section 12.3 was deemed unnecessary. In dicta the Commission predicted that if a court found that the

---

51. Rather than foreclose the possibility that FPC could one day speak to this issue, we said judicial resolution would be proper "unless the FPC undertakes to directly speak on this matter." 476 F.2d at 126. We meant, of course, that the FPC could address the issue directly in a case where it is fairly presented and necessary to the case's resolution. This is not such a case.

52. FPC's reasoning was inspired by Judge Brown's concurring opinion in *International Paper*.

clauses created "open-ended" liability, FPC would be "compelled to find that such clauses are unduly preferential." It reasoned that while the substitute fuel clauses did not themselves create undue preferences, they could "bring about instances of undue preferences." That is, the prospect of open-ended liability might cause United to disobey the curtailment order and favor the customers whose contracts contained such clauses. In addition, the Commission expressed a secondary fear that "open-ended" liability might impair United's financial integrity and consequently injure the consuming public.

### E. The Proper Inquiry

In deciding whether to adopt United's proposed section 12.3 the Commission used a test of redundancy. It asked whether the new section was necessary to United's avoidance of contract liability and implicitly assigned itself the task of determining United's contract liability. Once FPC concluded United was well nigh invulnerable anyway, it decided that section 12.3 should not be adopted. An unfortunate by-product of that approach is an arguably premature determination of United's contract liability via the doctrine of collateral estoppel. *Cf.* A. Duda & Sons Cooperative Association v. United States, 5th Cir. 1974, 495 F.2d 193, 198. With all due respect to the Commission, we believe redundancy was not the proper test.

To determine the proper test we start with the proposition that section 12.3 is an integral part of a proposed curtailment plan. In response to Order No. 431 United filed a proposed five-priority curtailment plan embodied in section 12 ("Impairment of Deliveries") of its tariff. FPC assigned the proposal Docket No. RP71-120. In addition to expanding section 12's priority levels to five, the new tariff proposal added to section 12.3 the statement that no payments or credits for substitute fuels would be made or given in the event of curtailment. Thus the proposed exculpatory

provision was part and parcel of United's proposed curtailment plan.

The Supreme Court has said that section 4(b) of the Natural Gas Act provides the substantive standard governing FPC evaluation of curtailment plans. FPC v. Louisiana Power & Light Co., 1972, 406 U.S. 621, 642, 92 S.Ct. 1827, 1839, 32 L.Ed.2d 639. Section 4(b) provides:

> No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

15 U.S.C.A. § 717c(b) (1963). Since section 12.3's exculpatory provision is part of a curtailment plan, it should be measured by section 4(b)'s standards. The exculpatory provision does not create a difference in rates, charges, service or facilities; therefore it should be evaluated in light of section 4(b)(1).

The proposed provision is intended, of course, to remove United's contractual liability to pay for the extra fuel costs occasioned by curtailment. In regard to United's prospective liability on a general breach of contract theory, the Commission predicted what would happen without the proposed tariff change—the curtailment order would provide an invulnerable impossibility defense. We think the Commission should have determined what would happen *with* the proposed change in effect. Can a tariff provision remove general contractual liability? If the provision would remove liability, would the unavailability of damages subject United's curtailed customers to "any undue prejudice or disadvantage?" In short, since the Commission cannot adjudicate contract liability, it should evaluate section 12.3 on the assumption that United faces

possible liability—not on the assumption it is immune. The damage suit is pending; United's contract liability remains undetermined. By assuming United's immunity FPC assumes too much.

In regard to the substitute fuel clauses FPC said United's potential liability was limited to "a maximum of seven days." In Opinion 606–A FPC had implied that it could abrogate the substitute fuel clauses under its power to eliminate undue preferences and thus provide United a second line of defense. It chose not to do so in Opinion 647 because the liability they created was minimal. Apparently FPC believed that minimal liability likewise made an exculpatory tariff unnecessary. We must object to that reasoning.

■■■ Our initial disagreement is with FPC's interpretation of the substitute fuel clauses. Rather than systematically analyze these clauses' language and the parties' intentions in including them, the Commission made the bald assertion that "the potential liability of United is for a maximum of seven days." This assertion cannot stand without supporting reasons; we must hold it to be without force or effect.

We will illustrate some of the problems we find in FPC's analysis of the substitute fuel clauses. First, we must question the Commission's choice of words when it said United's liability was for "a maximum of seven days." The plain language of the contract with International Paper says "seven *consecutive* days," exposing United to a new period of liability each time it resumes delivery after a curtailment. Obviously United's liability is not limited to a total of seven days through the life of the contract.

Second, the Commission seems to have ignored the intricacies of the substitute fuel clause in International Paper's contract with United. That clause specifically provides that United must pay whenever it requests its customer to curtail.[53] Therefore a request automatically subjects United to limitless liability; but the Commission does not tell us whether or not United has ever requested curtailment. Moreover, the seven-consecutive-day limitation comes into play only when the curtailment is executed unilaterally, without a request by United. However, the Commission did not say why the parties differentiated between requested curtailment and unilateral curtailment. International Paper argues persuasively that the "request" distinction provided for emergency situations when United would be unable to communicate with its customers. If that is the case, the seven-day limitation would not apply to routine curtailment caused by a chronic gas shortage. Whatever the case may be, FPC's interpretation would not be complete without analysis of International Paper's contentions.

We must also reiterate our objection that the Commission did not inquire into what effect the proposed exculpatory tariff provision would have. In dicta it said that if a court construed the substitute fuel clauses to create "open-ended" liability, it would have to abrogate them as "unduly preferential" and "inconsonant with the public interest." Would section 12.3 have prevented such an undue preference by effectively abrogating the substitute fuel clauses? If it did abrogate them, would that subject International Paper and the others to "any undue prejudice or disadvantage?" In other words, the Commission has given us an unsupported estimate of the substitute fuel clauses' meaning instead of its expert assessment of the desirability and legal impact of the tariff provision presented for its approval.

For the reasons we have expressed above we vacate those portions of Opinions 647 and 647–A which interpret United's contracts and assess its potential liability. On remand the Commission should reconsider section 12.3's exculpatory language in light of the crite-

53. *See* note 47, *supra.*

ria set forth in section 4(b) of the Natural Gas Act.

## VI. A New Curtailment Plan Ordered

Prior to the issuance of Opinions 647 and 647–A United was curtailing according to a four-priority plan. Those opinions required United to file new tariff sheets embodying a new five-level plan that was a slight modification of FPC's plan first set out in Order 467[54] and Opinion 643, the Arkla proceedings.[55] The plan is set out in part II(B)(4) of this opinion. The new plan, based on end use, caught all the parties by surprise. No one had suggested a similar plan, and many parties raised objections on appeal in an attempt to protect their precious gas supplies. As one might expect, there are as many objections as there are differing economic interests.[56]

### A. The Arguments

Throughout the thirty-seven briefs and three hours of oral argument we find several recurring major alleged flaws in the new plan, and we shall state them briefly. First we see a clash between United's direct and indirect customers. The direct customers buy directly from United; the indirect customers buy from an intermediary, usually a pipeline or city gate, who has in turn bought from United. The direct customers complain that their indirect counterparts will not be so severely affected by curtailment because FPC does not force the city gates or pipelines to curtail in accordance with the United plan; they can distribute their gas any way they choose. And since they get gas from sources other than United,

they will have plenty of gas for their customers. Furthermore, the pipelines get a second-level priority for injections into their storage facilities, insuring a ready supply when curtailment is going on at the lower levels.

Another clash exists between the old customers and the new arrivals. The old customers complain that United instituted new service with knowledge that the shortage would make it impossible to meet the new commitments. They claim that constitutes an undue preference, and the new arrivals should be subordinated to United's longtime patrons.

Others attack the distinction FPC has made between United's firm and interruptible customers.[57] The interruptible customers claim FPC should not have subordinated them to the firm customers because that makes a distinction based on contract rights when FPC intended this to be an end use plan.

Still other petitioners complain that city gates' and power plants' base volumes are too high and should be rolled back to their 1970 levels. For the last three years United has adjusted their base volumes upward three and eight percent respectively to permit growth on their systems. The city gates and power plants make the counterargument that FPC erred in discontinuing the annual upward adjustments.

Some of the industrial customers complain that FPC erred in abolishing the 3,000 Mcf/day "exemption" United had given them. They claim the exemption is necessary to protect the small-volume industrial customers.

In addition to these major battles there are minor skirmishes. For exam-

54. See note 25, supra.

55. See note 23, supra.

56. In the words of the harried FPC's able solicitor: "In short, what we have is a group of petitioners none of which will concede that a program can ever be just and reasonable unless their individual gas supply is given highest priority and highest protection." Oral argument transcript at 101.

57. Interruptible customers get their gas on a "when available" basis. In the Commission's words, interruptible service is service "from schedules or contracts under which seller is not expressly obligated to deliver specific volumes within a given time period, and which anticipates and permits interruption on short notice, or service under schedules or contracts which expressly or impliedly require installation of alternate fuel capability." Order Upon Reconsideration of Opinion No. 647–A, Docket Nos. RP71–29, RP 71–120, United Gas Pipe Line Co. (July 20, 1973) at 6.

ple, Gulf States alleges that the base requirements of two of its power stations have been incorrectly calculated. International Paper complains that its Mobile plant is the only one whose base volume is determined by its contract rather than its historic usage. And General Motors argues that the new curtailment plan in Opinions 647 and 647–A is based not on the record in this proceeding but on Order 467, an allegedly invalid administrative rule.

### B. Ripeness

The series 647 opinions required United to adopt the new five-priority plan and ordered hearings to explore the impact it would have on United's customers. Consequently on June 29, 1973, United filed tariff sheets embodying the new plan. The filing was a reluctant move; United expressed its belief that the new plan would have a "severe impact" on the direct industrial customers and therefore asked FPC to postpone the tariff's effective date until an impact study had been made. Again on July 31, 1973, United urged FPC to stay the plan's implementation "until accurate end use data have been obtained and the precise impact of implementation has been calculated and assessed in the remanded proceedings by all parties affected by the changed order of priorities." When FPC accepted United's five-priority tariff filings on November 2, 1973, United and others petitioned again for postponement, this time alleging a disproportionate impact on southern industry. FPC finally yielded to the pressure for postponement and issued a telegraph order on November 14:

> The Commission has received a number of requests for special relief, and for stay of Commission order of November 2, 1973, in this docket. Sworn allegations of serious and irreparable injury have been made. To preserve the status quo and permit sufficient time for notice and consideration of all motions filed, you are hereby directed to continue curtailment under the three-priority curtail-

ment plan presently in effect until further order of the Commission.

Appendices to NOPSI reply brief at 94; appendices to Utilities' motion for order directing to file additional evidence, etc., at 94. FPC issued a clarifying order on November 30, stating that it had expected all market data to have been submitted by November 5 so that the impact hearings ordered by Opinion 647 could proceed before the Administrative Law Judge. The Commission went on to direct United to file an impact study by February 1, 1974. The Commission stated its intention of reaching a "prompt determination as to whether further delay of the five-priority plan is justified."

At the present time all concerned are awaiting the outcome of the hearings which will determine the new plan's predicted impact on United's various classes of customers. A group of petitioners calling themselves the Utilities have asked this court to defer judicial review until this new information is available, that is, until the FPC has evaluated the hearing's results and determine to put the plan into effect. Utilities argue that the market data may convince FPC that its plan will have an unduly harsh effect on southern direct industrial customers and cause it to alter or abandon the plan. To review a plan that that may never be effective is, they argue, an exercise in futility.

United, on the other hand, finds itself in a remarkably convoluted posture on this issue because of its understandable desire to preserve the 647 opinions for collateral estoppel use in later damage suits. It desires to postpone implementing the new plan but simultaneously argues that the five-priority plan is just and reasonable, supported by substantial evidence. Even though its impact study shows the plan may have a disproportionate, seasonally fluctuating impact on direct industrial customers, United urges that we should not delay in determining that the plan is supported by substantial evidence. We are further asked to approve FPC's finding that United

has never acted "improvidently" in its curtailment program.

The Commission argues that its stay does not mean it regards the new plan as unjust or unreasonable. On the contrary, it suggests that the only issue is *when* to implement the plan.

 After careful consideration of these various positions, we find that the Utilities have made a meritorious point. It would be a waste of judicial energy to review a plan that may never be used.[58] Moreover, we are most hesitant to consider approving a curtailment plan as "just and reasonable" or "supported by substantial evidence" with no idea of its probable economic impact. For example, United's impact study shows that the five-priority plan likely will completely shut off some customers' gas supplies for several months in the winter. The three-level plan, by contrast, should curtail no one 100%. Surely such projections are relevant to any determination of whether the plan will create undue prejudice or undue preferences under the terms of the Natural Gas Act. How can one say a preference is not undue if its extent is not known? We must conclude that the five-priority plan is not yet ripe for review.

### C. FPC's Authority

 Prior to Opinion 647 United had curtailed in accordance with three different plans; the plan in effect when Opinion 647 appeared had four priorities. The Commission approved all three plans as "just and reasonable." It reduced the four-level plan to three levels and declared that modification just and reasonable. In the same opinion it ordered United to make tariff revisions embodying an entirely new five-level plan. That action is subject to the same criticism as FPC's immediate downgrading of boiler gas's priority: the Com-

mission acted without statutory authority because it failed to find that the currently effective plan did not meet section 4(b) standards. See section III(D) of this opinion, *supra*. If FPC desires to put the new plan into effect, it must re-examine the four-priority plan which we have ordered reinstated. If that interim plan fails fully to satisfy section 4(b) then FPC may require United to use the new five-level plan.

### D. Other Matters

Since FPC will have an opportunity to reconsider these opinions and shore up their weaknesses, we think a few comments at this point may expedite their ultimate judicial approval. One basic problem is that the series 647 opinions promulgated the new curtailment plan in a manner that makes judicial review difficult. They adopted the reasoning of Opinion 643 and Order 467 without relating it to the record evidence developed in United's case, Docket Nos. RP71–120 and RP71–29.

 FPC should not forget that United's new curtailment plan eventually must withstand a substantial evidence review. That is, FPC must give reasons supported by findings, and those findings must have support in the record compiled in *this case*. All too often in the series 647 opinions findings and supporting evidence are absent. In this appeal able lawyers for United and FPC have tried to comb the record and, after the fact, find record support for the curtailment plan; at times, however, the record support has been thin. FPC could improve its chances for favorable judicial review by making explicit fact findings to support its reasoning, and by making record references that demonstrate its fact findings have evidentiary support. That would be far more convincing than the efforts of the ablest ap-

---

58. At oral argument the Commission's solicitor informed the court that the five-priority plan may never see the light of day. "I concede to you that in view of the fact that there is a remanded proceeding that it is conceivable that the Commission when it considered this updated data might decide that the five-priority plan should not be implemented and should be modified prospectively." Oral argument transcript at 105–6.

pellate attorney seeking to put the opinion in a favorable light. *See* FPC v. Texaco Inc., 417 U.S. 380, 395–397, 94 S. Ct. 2315, 41 L.Ed.2d 141 (1974). And it would convince a court that the Commission was tailoring its order to the case before it instead of attempting to issue a general rule without record support. Promulgating a curtailment plan without relating it to the record evidence in the particular case creates the danger that the plan will not be suitable for that particular company, its customers or its region. It is a distinct possibility that no one curtailment plan will be suitable for nationwide application.

We will not examine now each priority in the curtailment plan; we can illustrate our point by dissecting FPC's treatment of United's interruptible customers. The new curtailment plan reserves the lowest priority, level 5(B), for "[a]ll direct and indirect interruptible requirements of 300 Mcf or more where alternate fuel capabilities can meet such requirements." The stated justification for so doing is twofold: interruptible customers have alternate fuel sources available, and they put their gas to inferior uses. This reasoning loses its forcefulness upon closer inspection. The first reason, availability of alternate fuel sources, adds nothing; category 5(B) specifies that the customer must have an alternate fuel capability. Furthermore, interruptible customers who have no alternate fuel capability are relegated to the third level regardless of the end use to which they put their gas. Therefore alternate fuel capability clearly is not determinative, even in the Commission's scheme of things.

That leaves the second reason: interruptible customers use gas for inferior purposes. At the outset we note that this reason has little record support. One witness testified that all of his

plants which used gas for process purposes also had firm contracts. Since process gas is accorded a relatively high priority (second-level), one might infer that all gas put to superior uses is sold under firm contracts, not interruptible contracts.[59] But another witness said his plant used gas for process purposes, and his company bought the gas under an interruptible contract.[60] These are the only portions of the record that the parties have been able to point to in reference to the relation between end use and interruptibility; the Commission pointed to none in its opinions. As anyone can see, the Commission asks a great deal by expecting a court to call that evidence "substantial." We wonder, moreover, why FPC went to the trouble of singling out the "interruptibility" factor in the first place. If interruptible customers really do make inferior uses of their gas, why inject any factor in addition to end use? Why not curtail simply on the basis of end use alone?

Another area in need of further explanation is FPC's decision in Opinion 647–A to give a high (second-level) priority to pipeline customers' storage injections. FPC reasoned that summertime storage injections would reduce the total amount of curtailment in the winter, and it would protect high priority customers in the winter. We understand the first argument, but the second is more elusive. It presumes that the pipelines will favor those customers which, in terms of the United curtailment plan, put their gas to a superior use. However, as best we can tell, the pipelines are not subject to United's curtailment plan. That plan merely determines how much gas they will get; how they distribute it to their customers is up to them.[61] How, then, will a high priority for pipeline customers' storage protect the "superior" users?

59. J.A. 3562.

60. J.A. 2509.

61. Although at oral argument FPC's solicitor said the Commission is in the process of promulgating curtailment plans for each of United's pipeline customers, the record gives no hint of their substance or effective dates. *See* oral argument transcript at 155.

## VII. Refusal to File an Environmental Impact Statement

### A. The Arguments

In its brief FPC argues that it may escape the impact statement requirement [62] by giving reasons why one is unnecessary. While Opinions 647 and 647–A gave no detailed list of reasons, they adopted the reasons given in El Paso Natural Gas Co., Docket No. RP72–6. These reasons, summarized in part II(B)(5) above, amount to an assertion that the environmental consequences of a curtailment plan are contingent and incapable of accurate measurement—in short, unknowable. [63]

FPC refined its reasoning in a recent order and concluded that the impact statement requirement directly conflicted with its statutory duty to construct curtailment plans that eliminate discriminatory practices.

> Under Section 5(a) of the Natural Gas Act we have a statutory duty to correct discriminatory practices by natural gas companies. It would be extremely difficult to construct a curtailment plan so predictable in effect that it would be adaptable to analysis by an environmental impact statement, but, if we did so, such a plan would be so inflexible that it would not carry out our statutory duty to approve or prescribe a plan that would be just and reasonable to the numerous and varied distributing companies and ultimate consumers on Transco's system. We therefore conclude that it is inappropriate and derogatory of our *statutory duty* to require our Staff to prepare an environmental impact statement in this proceeding. (Emphasis supplied)

Order Denying Motion for Extraordinary Relief, Transcontinental Gas Pipe Line Corp., Docket No. RP72–99 (Apr. 30, 1974) at 3. .

FPC's opponents on this issue are not environmentalists but, for the most part, parties whose economic interests are threatened by gas curtailment. To prevent, or at least postpone, the effective date of the new five-priority plan these parties argue that gas curtailment must be preceded by an environmental impact statement. They point out that NEPA requires an impact statement whenever (1) any federal agency (2) takes an action "significantly affecting the quality of the human environment." Obviously FPC is a federal agency; and it is almost equally obvious that a curtailment plan will affect the environment. If clean natural gas cannot be burned, a dirtier alternate fuel will be substituted. And dirtier fuels mean more air pollution.

### B. The Issue Resolved

At issue is whether an impact statement is a prerequisite to the permanent, five-priority curtailment plan proposed by FPC. Although one party argues to the contrary, it is well settled that FPC is not required to file impact statements for interim curtailment plans. Atlanta Gas Light Co. v. FPC, 5th Cir. 1973, 476 F.2d 142, 150; *accord*, American Smelting and Refining Company v. FPC, D.C.Cir. 1974, 494 F. 2d 925. All the curtailment plans actually utilized by United from the beginning of curtailment in fall 1970 to the present time have been interim plans. Therefore FPC unquestionably acted properly in approving them without impact statements.

In refusing to file an impact statement for the curtailment plan imposed by Opinion 647, the Commission has presented this court with a question of

---

62. *See* section II(C)(5) of this opinion, *supra*.

63. Opinion 647 provided that on remand the parties would have a chance to show ways in which the new plan would have "particular adverse environmental impact." It is appar-

ent to us, however, that merely giving the polluters a chance to complain of predicted pollution after the plan has been devised is a poor substitute for the agency's thorough environmental evaluation while it formulates the plan.

first impression: whether NEPA requires FPC to file environmental impact statements for permanent curtailment plans. NEPA's section 102(C) [64] contains two avenues of escape for federal agencies wishing to act without an impact statement. They can argue that they are required to file an impact statement only "to the fullest extent possible"; if drafting the statement proves too burdensome, then it is not "possible" to file one. A second way out is to contend the proposed agency action is not "major" and will not "significantly" affect "the quality of the human environment."

Taking the last avenue of avoidance first, no one here argues that curtailment will not have a significant effect on the environment. FPC argues the impact will be unpredictable and uncertain, but it does not contend it will be insignificant.

That leaves one avenue, the statute's qualification that agencies must comply only to "the fullest extent possible." That language at first glance would appear to create a wide loophole for agencies so pressured by other demands that environmental considerations pale in importance, but the case law and legislative history suggest the contrary.

In one of the leading cases exploring the intricacies of NEPA, the D.C. Circuit treated this "fullest extent possible" language in depth. To find its meaning, the court quoted the language's legislative history.

* * * The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in * * * [Section 102(2)] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible. * * * Thus, it is the intent of the conferees that the provision "to the fullest extent possible" shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section 102. Rather, the language in section 102 is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section "to the fullest extent possible" under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.

Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 1971, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114–1115, *quoting* 115 Cong.Rec. (Part 30) at 40417–18. These views of the Senate and House conferees led the court to remark:

Thus the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of *statutory* authority. Considerations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance.

*Calvert Cliffs', supra,* at 1115. In a like vein are the views of the Council on Environmental Quality:

The phrase "to the fullest extent possible" . . . is meant to make clear that each agency of the Federal Government shall comply with the requirement unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.

*Calvert Cliffs', supra,* at 1115 n. 12, *quoting* 36 Fed.Reg. at 7724.

This circuit has agreed with the *Calvert Cliffs'* court that the qualifying words "fullest extent possible" mandate compliance unless compliance would lead to a violation of a statutory obligation. Atlanta Gas Light Co. v. FPC, 5th Cir. 1973, 476 F.2d 142, 150. In that case we held that requiring FPC to file an impact statement for interim curtailment plans would do violence to a pre-existing statutory duty.

64. 42 U.S.C.A. § 4332(C) (1973).

As *Louisiana Power & Light Co. . . .* makes clear, the Federal Power Commission has a statutory duty to the public under the Natural Gas Act to take effective interim curtailment action in the exigencies presented by the gas shortage. We cannot say that the NEPA suspends this duty of the Commission.

476 F.2d at 150. Therefore FPC was relieved of the impact statement obligation in regard to interim curtailment. *Accord,* American Smelting and Refining Co. v. FPC, D.C.Cir. 1974, 494 F.2d 925.

 In our view *Atlantic Gas Light, Calvert Cliffs',* and *American Smelting* say that an agency contemplating taking an action that will have a significant effect on the environment must file the best impact statement possible unless filing will conflict with a statutory duty. In the absence of a statutory conflict, some sort of impact statement must be drafted. If the agency can demonstrate that drafting an impact statement will prevent its performing a statutory duty, then it will be absolved from that environmental duty.

With this in mind, we will examine FPC's reasons for acting without an impact statement. In Opinions 647 and 647–A FPC spoke to this matter by adopting the reasoning of an earlier order issued in *El Paso Natural Gas Co.* That reasoning, which we have already discussed above, boils down to the difficulty of ascertaining the environmental effects of gas curtailment. In the meantime, however, the D.C. Circuit has served notice that mere difficulty not amounting to statutory impossibility will be no excuse. In the *American Smelting* case it permitted FPC to implement an interim curtailment plan without an impact statement, but added this admonition.

It should be understood, however, that our ruling today is not a license for permanent or prolonged evasion of responsibilities under NEPA. If it becomes clear that the Commission's non-compliance is attributable to motives *other than statutory impossibility,* interested parties will not be barred by this opinion from seeking appropriate relief. (Emphasis supplied)

American Smelting and Refining Co. v. FPC, D.C.Cir. 1974, 494 F.2d 925, 949, n. 47. FPC's response came in an order not before this court for review, issued in *Transcontinental Gas Pipe Line Corporation,* Docket No. RP72–99 (April 30, 1974).[65] The pertinent part is set out in part VII(A) of this opinion, *supra.* In effect that language says, "We have always said that the environmental effects of gas curtailment plans are so unpredictable that a meaningful impact statement is not physically possible. That means, of course, in order to draft a meaningful impact statement we would have to create a curtailment plan so inflexible that we would violate our statutory duty to formulate a just and reasonable plan that will prevent undue preferences."

 Were an unsatisfactory curtailment plan certain to follow from NEPA compliance, we would agree with FPC that impact statements were statutorily impossible. But we do not agree that curtailment plans must be fashioned solely to produce an environmental effect easily described on an impact statement; in that event the tail would wag the dog. NEPA's purpose is to make an agency consider the environmental effects of its actions; the impact statement requires the agency fully to disclose that evaluation, thus proving the evaluation has been made and warning interested parties of the probable

---

**65.** While the Transcontinental order is not before this court for review, we discuss its reasoning solely for the purpose of giving FPC the benefit of the doubt. The reasons given in the series 647 opinions did not touch on statutory impossibility and thus were patently inadequate.

environmental effects. Scientists' Institute for Public Information, Inc. v. AEC, 1973, 156 U.S.App.D.C. 395, 481 F.2d 1079; Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 1971, 146 U.S. App.D.C. 33, 449 F.2d 1109.[66] *See* Annot, 17 A.L.R.Fed. 33, § 4. However, we must remember that NEPA also provides:

> The policies and goals set forth in this chapter are *supplementary* to those set forth in existing authorizations of Federal agencies. (Emphasis supplied)

42 U.S.C.A. § 4335 (1973). Thus FPC's primary obligations remain the same; NEPA merely adds a secondary responsibility by mandating that FPC consider the environment in carrying out its statutorily mandated duties. NEPA does not repeal FPC's statutory duty. *See generally* United States v. Students Challenging Regulatory Agency Procedures, 1973, 412 U.S. 669, 93 S.Ct. 2405, 2419, 37 L.Ed.2d 254. In carrying out its curtailment function FPC's primary obligation is to approve plans that allocate scarce natural gas without creating undue preferences among customers. In our view NEPA merely requires that FPC, in formulating that plan, take into consideration as best it can the plan's probable effect on the environment. FPC certainly should not devise an impotent curtailment plan just to improve its impact statement. That would be sacrificing its primary obligation to meet a lessor one

■ Having decided that there is no statutory impediment to FPC's filing impact statements for curtailment plans,

we address now the Commission's belief that the task is too difficult because of the many variables and uncertainties involved. Our remarks are prompted by the Commission's lack of confidence in its ability to prepare these impact statements, and by our realization that the resourceful FPC bar will attempt to use the new requirement to block unfavorable FPC actions. It is our view that so long as the impact statement reflects a good faith attempt fully to evaluate a curtailment plan's environmental effects, reasonable alternatives, and other factors listed in NEPA, we will consider the statement adequate.[67] We do not intend the impact statement requirement to be a weapon for disappointed parties.

We are sympathetic to FPC's objection that the impact of curtailment plans is uncertain and therefore speculative. That objection brings to mind the words of another court.

> The agency need not foresee the unfor[e]seeable but by the same token neither can it avoid drafting an impact statment simply because describing the environmental effects of and alternatives to particular agency action involves some degree of forecasting. And one of the functions of a NEPA statement is to indicate the extent to which environmental effects are essentially unknown. It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by

---

**66.** *See generally* Save Our Ten Acres v. Kreger, 5th Cir. 1973, 472 F.2d 463. "NEPA was intended not only to insure that the appropriate responsible official considered the environmental effects of the project, but also to provide Congress (and others receiving such recommendation or proposal) with a sound basis for evaluating the environmental aspects of the particular project or program." *Id.* at 466.

**67.** *See* Natural Resources Defense Council, Inc. v. Morton, 1972, 148 U.S.App.D.C. 5,

458 F.2d 827. "So long as the officials and agencies have taken the "hard look" at environmental consequences mandated by Congress, the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Id.* at 838. A complete list of the factors to be considered in evaluating environmental consequences is given in NEPA's section 102(C), 42 U.S.C.A. 4332(C) (1973).

agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry." Scientists' Institute for Public Information, Inc. v. AEC, 1973, 156 U.S.App.D. C. 395, 481 F.2d 1079, 1092.

Although we require FPC to attempt to forecast the environmental effects of its actions, we emphasize that the obligation is imposed subject to a rule of reason. The impact statement requirement, like the rest of NEPA, "must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible . . . ." Natural Resources Defense Council, Inc. v. Morton, 1972, 148 U.S.App.D.C. 5, 458 F.2d 827, 837. After all, the statute itself requires compliance to the fullest extent possible, recognizing that some situations are more conducive to environmental analysis than others. FPC should not pour an inordinate amount of its resources into environmental forecasting. The Commission's task is to make a good faith effort to describe the reasonably foreseeable environmental impact of each curtailment plan using the five factors listed in NEPA's section 102(C). *See Scientists' Institute, supra,* 481 F.2d at 1092.

VIII. Conclusion.

Opinions 647 and 647–A attempted to end the prolonged battle in which United and its customers have sought to hammer out a curtailment plan that is fair to all concerned. Unfortunately we have found errors that require us to remand this case and permit FPC to try again. FPC's principal error was its failure to find the currently effective (four-priority) plan inadequate before imposing new interim and permanent curtailment plans. That omission removed FPC's claim to statutory authority for altering United's curtailment plan. Furthermore, even if FPC had been within its

statutory authority in ordering the new five-priority plan, the plan will not be ripe for review until FPC completes the hearings concerning its impact and decides to put it into effect. And, as we have pointed out, the Commission also erred in failing to file an environmental impact statement.

If the Commission persists in its desire to implement the permanent five-priority plan, we recommend these steps on remand. It should prepare the best environmental impact statement it can in light of the difficulty of the problem and the limitations on its resources. It should reconsider the four-priority plan in light of the standards set out in section 4(b) of the Natural Gas Act. If the plan does not fully satisfy 4(b) as a plan to be used permanently FPC may then turn its attention to the five-priority plan. It should ask whether United's past curtailment actions have created undue preferences which are perpetuated by that plan. In determining whether the five-priority plan meets section 4(b) standards, FPC should consider the impact date developed on remand. It should determine whether proposed section 12.3's exculpatory language would unduly prejudice the customers who have been curtailed. Finally, FPC should, wherever possible, marshal record evidence to support the plan's priority structure. If such evidence was not developed in the previous round of hearings, the impact hearings now going on could be used for that purpose.

For the present we must order the four-priority plan reinstated and remand this case to the Commission for further proceedings consistent with this opinion.

Prior to, during, and after oral argument in this case, the parties filed a variety of motions. Because we believe this opinion adequately meets the contentions raised therein, all pending motions are hereby denied.

Vacated and remanded.